NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0683n.06

No. 16-3321

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| BRADLEY J. DELP REVOCABLE TRUST DATED JANUARY 8, 1992, AS AMENDED; BRADLEY J. DELP, Individually, and as Trustee of the Bradley J. Delp Revocable Trust dated January 8, 1992, as amended, | **FILED**<br>Dec 16, 2016<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | |
| v. | |
| MSJMR 2008 IRREVOCABLE TRUST DATED DECEMBER 31, 2008, AS AMENDED; CLEVES R. DELP, Individually, and as Trustee of the MSJMR 2008 Irrevocable Trust dated December 31, 2008, as amended, The Cleves R. Delp Revocable Trust dated July 4, 1992, as amended; and John Doe Nos. 1-20, | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Defendants-Appellees. | |

BEFORE: DAUGHTREY, CLAY, and COOK, Circuit Judges.

CLAY, Circuit Judge. Plaintiffs Bradley J. Delp Revocable Trust, dated January 8, 1992, as amended ("Delp Trust"), and Bradley J. Delp, individually and as trustee of the Delp Trust ("Bradley") (collectively, "Plaintiffs"), appeal the judgment entered by the district court dismissing Plaintiffs' Second Amended Complaint with prejudice and denying Plaintiffs' post-

judgment motions. For the reasons set forth in this opinion, this Court **AFFIRMS** the district court's judgment.

## I. STATEMENT OF FACTS

### a. Factual Background

This action arises from a business dispute between two brothers. Bradley and Cleves R. Delp ("Cleves") are brothers who were joint owners of a family business, The Delp Company, in the early 1990s. Each brother owned, through trusts, 49 percent of The Delp Company, with the remaining two percent owned by the Delp Independence Trust. Additionally, each brother owned, through trusts, 50 percent DelHold, LLC, a holding company for the family's business interests. Plaintiffs primarily claim that Cleves and Christopher Erblich (The Delp Company and DelHold, LLC's attorney), among others, breached their fiduciary duties by wrongfully misappropriating Bradley's 49 percent interest in the family business.

### b. Procedural History

On March 18, 2014, Plaintiffs filed a complaint against eight defendants, including: Cleves, individually and as trustee of both the MSJMR 2008 Irrevocable Trust dated December 31, 2008, as amended, and the Cleves R. Delp Revocable Trust dated July 4, 1992, as amended; and Christopher Erblich, individually and as trustee of the KASL 2008 Irrevocable Trust, dated December 31, 2008, as amended, and the Christopher E. Erblich Revocable Trust, dated December 1, 1998, as amended.

The parties engaged in several rounds of motions practice relating to the sufficiency of the allegations in the initial Complaint, First Amended Complaint, and Second Amended Complaint. On December 5, 2014, the district court held a status conference to generally discuss an efficient way to determine the threshold issue in the case at that point—whether Bradley sold

his interests in the two family businesses, The Delp Company and DelHold, LLC. On December 12, 2014, the district court entered an order, with the agreement of counsel, which dismissed certain defendants without prejudice and directed the remaining parties to engage in focused discovery related to threshold issues, including Bradley's ownership interest in The Delp Company and DelHold, LLC.[1] The court set a deadline for the exchange of discovery requests and responses and set a status conference on the matter for March 27, 2015.

### 1. Bradley's Production of Privileged and Confidential Documents

On February 27, 2015, Bradley produced roughly over 65 pages of documents, some of which Defendants argue that Bradley stole. These "stolen" documents contained Defendants' attorney-client communications, Defendants' counsel's legal analyses and memoranda, and detailed conference call agendas of attorney calls pertaining to this action. Several of these documents were labeled "Attorney-Client Privileged Communication," or "Confidential Information For Attorneys' Eyes Only," and several of these documents were emails referencing an attached CaseMap with Defendants' litigation strategy and an ex parte mediation statement. (Pls.' App. Joint Exs. 2−5, PageID# 36−37, 38−39, 105.) On March 27, 2015, Defendants informed the district court that Plaintiffs had produced several confidential documents and requested permission to investigate this data breach. The district court granted Defendants' request, stayed all deadlines, and ordered Plaintiffs' counsel to deliver the identified documents to the district court.

### 2. Bradley's Deposition

On April 28, 2015, Defendants deposed Bradley, who was represented by his counsel and a separate criminal attorney. During the deposition, he refused to answer any questions relating

---

[1] The parties that remained at this point in the litigation are the parties that are involved in this appeal.

to the amount of privileged and other materials in his possession, the scope of the materials he reviewed, how he obtained the privileged and confidential materials, and whether he still had access to those materials. Bradley asserted his Fifth Amendment right against self-incrimination over 70 times during the deposition.

### 3. Defendants' Motion for Sanctions

Due to his refusal to answer Defendants' questions, Defendants moved the district court to dismiss Plaintiffs' Second Amended Complaint as a sanction pursuant to its inherent authority. In response to the Motion for Sanctions, Plaintiffs moved the district court to appoint a special master to review the privileged and confidential documents and requested a continuance to file the opposition to the Motion for Sanctions. Defendants opposed Plaintiffs' special master appointment and continuance motion, arguing that such appointment was unnecessary since the district court had reviewed the documents and determined that they had been accurately classified as privileged and confidential. The district court denied Plaintiffs' continuance request, and set the Motion for Sanctions and special master appointment motion for hearing on July 28, 2015. The district court later continued the hearing.

On August 10, 2015, Bradley requested permission from the district court to withdraw his Fifth Amendment assertions and to supplement the record with an affidavit, which would "provide the truth" about the privileged and confidential documents. (R. 78, Pls.' Mot. to Withdraw, PageID# 813 (stating that "the affidavit will provide the truth surrounding the possession of the at-issue documents").) He also requested an evidentiary hearing on the matter in order "to uncover the facts necessary to determine the issues of willful behavior, privilege, and undue prejudice to the defendants" so Plaintiffs could oppose the Motion for Sanctions. (*Id*. at

819−20).  The district court granted Bradley's motion to supplement the record with his affidavit and his request for an evidentiary hearing.

### 4. Three-Day Evidentiary Hearing

The evidentiary hearing was held for three days in October 2015.  In both the affidavit and at the hearing, Bradley explained how, when, and why he obtained the privileged documents, the scope of his review, and the extent of his unauthorized access to Cleves' computer at The Delp Company's office in Maumee, Ohio.  The Court notes the following discrepancies between Bradley's affidavit and the testimony presented at the hearing.

First, Bradley explained in his affidavit that he found certain documents in the company's main conference room during the weeks of March 28, 2011 and June 6, 2011.  At the hearing, he claimed that these documents were left on a shelf under the phone.  Defendants provided testimony from the company's longtime employee, Beth Loy, that the company had a protocol for keeping track of and removing any documents or papers that were left behind in conference rooms.  The protocol involved morning and evening reviews of all the conference rooms, and an inspection of the room after each meeting.  The documents that Bradley claimed he took from the conference room on Tuesday, March 29, 2011, were dated February 15 and 18, 2011.

Second, Bradley explained in his affidavit that on Thursday, May 12, 2011 and Sunday, July 17, 2011, he entered Cleves' office and gained access to Cleves' email inbox without entering a password, and then printed every email that he viewed.  At the hearing, Bradley described that on both dates, he jiggled Cleves' computer mouse and Cleves' email inbox appeared on the screen.  He denied knowing Cleves' password or entering login information.  He testified that he searched Cleves' email inbox using the term, "Erblich," opened randomly

selected emails from those search results, printed every email he viewed, and produced to the court and Defendants every email he printed.

Defendants put the company's network administrator, Ryan Valek, on the stand. Valek testified that all of the company's computers required a password to login and that the each computer automatically logs out after ten to fifteen minutes of inactivity. Once logged out, the user would move the mouse to reactivate the computer, which would bring the user to a sign-in screen where the user would need to enter a password to gain access to email and any other part of the company's computer network. Valek also testified that the passwords change periodically and only an administrator could change any password or logout inactivity settings. Valek further testified that as the network administrator, he did not disable the password requirement for any computer used by Cleves.

Third, Bradley originally testified that he only searched and reviewed emails that contained the term "Erblich" because he was "looking for evidence of a conspiracy between Cleves Delp and Chris Erblich to unlawfully terminate [Bradley's] ownership in [The Delp Company] and DelHold." (R. 101−103, Evidentiary Hr'g Tr., PageID# 80−85, 115−17.) On cross-examination, Bradley's testimony was elusive as to whether he only searched and reviewed emails that contained the term, "Erblich." (*Id*. at 126−27.) When asked how he came upon a document that did not contain the term, "Erblich," he stated that he did not know. (*Id*.) Bradley also stated that his "Erblich" search was "primarily what [his] search was" for. (*Id*.) However, in response to the question of whether he performed more searches than just a search for the word "Erblich," he stated that he "only searched 'Erblich.'" (*Id*. at 127.)

Fourth, Bradley stated in his affidavit that he printed and produced every email that he reviewed from Cleves' email account. However, Defendants pointed out during the hearing that

several documents Bradley produced are missing random pages. (R. 101 at 91−92, 123 (noting at one point that a document he produced was a two-page document, but when they turned the first page, "there[] [was] no page 2[]").) He was unable to provide an explanation for this occurrence.

Fifth, Bradley testified that he reviewed and printed only emails and expressly denied opening and reviewing any attachments to Cleves' emails. However, some of the documents he produced were not only emails. He testified that, when he accessed Cleves' computer on July 17, 2011, he did not open an attachment to a July 13, 2011 email from Defendants' counsel for a scheduled July 19, 2011 mediation session between Cleves and Bradley. Bradley testified that on Sunday, July 17, 2011, he reviewed and printed the transmittal email containing this ex parte mediation statement, but denied opening or printing the attachment. (He explained that he was "more interested in the e-mail[]s transmitting a mediation statement versus what the mediation statement actually said." (*Id*. at 124.)

Sixth, he did not have authorized access to the company's building after June 10, 2011. Bradley stated in his affidavit and at the hearing that he never accessed the company's building after July 17, 2011 during non-business hours. However, Debra Matz, an employee of the company's nightly cleaning service, testified at the hearing that she witnessed Bradley enter the company's building after hours on November 12, 2012.

Seventh, Bradley stated in his affidavit that the reason why he took those documents from the conference room and accessed Cleves' computer and email inbox was because he had a good faith belief that he still owned parts of The Delp Company and DelHold, LLC at the time of those incursions. Bradley's statements and testimony on this issue is described as follows.

Bradley admitted during the hearing that he had transferred certain of his shares in The Delp Company prior to the date of the incursions. Plaintiffs' Second Amended Complaint claims that Bradley signed a purchase and sale agreement that established a $2,411,907.00 purchase price for his interest in the DelHold, LLC, even though the "parties had not yet agreed to all of the payment terms." (R. 37, Second Am. Compl., PageID# 364−65.) However, Bradley testified that he reported the sale of his interest in DelHold, LLC to the IRS in 2009 for $2,411,907.00. Moreover, he stated in his affidavit, dated August 10, 2015, that his ownership interest in DelHold, LLC, has been uninterrupted since the corporation was formed in 1992. His former lawyer wrote a letter to Cleves' lawyer, dated February 2, 2011, regarding the sale of Bradley's interest in The Delp Company and DelHold, LLC. (R. 101 at 12−20; Defs.' App., Ex. B, Feb. 2, 2011 Letter, PageID# 135−37 (letter stating that "[Bradley] Delp believes this was a sale to a trust created by Cleves Delp").) When asked at the hearing whether Bradley believed that, at the time this February 2, 2011 was written, he had sold his interest to a certain trust entity created by Cleves, he responded, "Possibly." (R. 101 at 15.)

### 5. Dismissal of Second Amended Complaint

On December 31, 2015, the district court issued an order dismissing Plaintiffs' Second Amended Complaint with prejudice as a sanction pursuant to its inherent authority. The district court reasoned that only dismissal with prejudice would properly address the knowledge Bradley gained from the incursions, punish him for his theft and attempted cover-up, protect the integrity of the judicial process, and deter others from committing similar offenses.

### 6. District Court Denied Plaintiffs' Post-judgment Motions

On January 28, 2016, Plaintiffs filed two post-judgment motions pursuant to Federal Rules of Civil Procedure 52(b) and 59(e) requesting that the district court alter or amend its

factual findings and alter or amend its judgment. On March 31, 2016, the district court denied Plaintiffs' Rule 52(b) and Rule 59(e) motions. The district court stated that a "review of all the evidence, including evidence purportedly supporting Plaintiffs' claim, led this [c]ourt to the inescapable conclusion that any merits analysis is necessarily tainted by Bradley Delp's contumacious conduct." (R. 121, Order Den. Post-judgment Mots., PageID# 1874.) On March 31, 2016, Plaintiffs filed their timely notice of appeal.

## II.  DISCUSSION

### a.  Defendants' Motion for Sanctions

Plaintiffs argue that the district court abused its discretion and exceeded its authority in dismissing Plaintiffs' Second Amended Complaint with prejudice because Bradley's alleged misconduct occurred prior to the litigation in this case, and thus, was not within the purview of the district court to consider. Furthermore, Plaintiffs argue that Bradley's conduct did not prejudice Defendants, that they were not given a pre-dismissal warning, and that the court could have imposed less severe sanctions. Defendants assert that the district court did not abuse its discretion in dismissing the action because it properly used its discretion and inherent authority to preserve the integrity of the judicial process and maintain a fair forum for its litigants.

#### 1.  Standard of Review

This Court reviews the district court's imposition of sanctions under the highly deferential abuse-of-discretion standard. *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008). An abuse of discretion is found when the Court is left with the "definite and firm

conviction that the court below committed a clear error of judgment." *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006) (quoting *Balani v. INS*, 669 F.2d 1157, 1160 (6th Cir. 1982)).

## 2. Relevant Legal Principles

A district court has the inherent power to sanction a party when that party exhibits bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43−50 (1991). The "imposition of inherent power sanctions requires a finding of bad faith," *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002), or conduct "tantamount to bad faith," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980). A district court's reliance upon its inherent authority to sanction derives from its power to impose respect in its presence, control the litigants before it, and guarantee the integrity of the courts. *See Chambers*, 501 U.S. at 43−44. Due to "their very potency, inherent powers must be exercised with restraint and discretion." *Id*. at 44 (citing *Roadway Express*, 447 U.S. at 764). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. at 44−45. As the Supreme Court observed in *Roadway Express*, "outright dismissal of a lawsuit, which [the Supreme Court] had upheld in *Link* [*v. Wabash R.R. Co.*, 370 U.S. 626 (1962)], is a particularly sever sanction, yet is within the court's discretion." *Chambers*, 501 U.S. at 45 (citation omitted).

This Court has identified four factors—the "*Regional Refuse* factors"—that guide our review of a district court's decision to dismiss a party's lawsuit as a sanction:

(1) whether the party's [conduct] [was] due to willfulness, bad faith, or fault;
(2) whether the adversary was prejudiced by the dismissed party's conduct;
(3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and
(4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Fharmacy Records v. Nassar*, 379 F. App'x 522, 523−24 (6th Cir. 2010) (alterations in original) (citing *Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005)); *see Regional Refuse Sys., Inc.*

*v. Inland Reclamation Co.*, 842 F.2d 150, 155 (6th Cir. 1988), *superseded by statute on other grounds*, *as recognized in* Vance, by and Through Hammons v. United States, 182 F.3d 920 (table) (introducing these factors); *Coleman v. Am. Red Cross*, 23 F.3d 1091, 1094 n. 1 (6th Cir. 1994) (noting that, "as other circuits have found, [] the factors considered when reviewing a dismissal under Rule 41(b), Rule 37(b), or a court's inherent power are largely the same"). Moreover, "[a]lthough typically none of the factors is outcome dispositive, it is said that a case is properly dismissed by the district court where there is a clear record of delay or contumacious conduct." *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 363 (6th Cir. 1999) (citation omitted). "Contumacious" is defined as "perverse in resisting authority" and "stubbornly disobedient." *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008) (quoting *Webster's Third New International Dictionary* 497 (1986)). If dismissal was warranted by contumacious conduct, the importance "of the remaining three factors" fades "in the face of th[is] conclusion." *Knoll*, 176 F.3d at 366; *see also Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 367 (6th Cir. 1997) (stating that "where a plaintiff has not been given notice that dismissal is contemplated, a district court should impose a penalty short of dismissal unless the derelict party has engaged in *bad faith or contumacious conduct*") (emphasis added) (citation and internal quotation marks omitted); *Freeland v. Amigo*, 103 F.3d 1271, 1280 (6th Cir. 1997) (holding that "*in the absence of contumacious conduct*, an alternate sanction that would protect the integrity of pretrial procedures should be utilized rather than dismissal") (emphasis added).

In *Link*, the Supreme Court affirmed a district court's decision to dismiss a complaint for failure to prosecute. *Id*. at 633. The Court described that "it could reasonably be inferred from his absence, as well as from the drawn-out history of the litigation . . . that petitioner had been deliberately proceeding in dilatory fashion." *Id*. The Supreme Court also noted, as to

11

petitioner's argument that the errant acts of the lawyer should not be bestowed upon the client, that:

> [t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.

*Id.* at 633−34. Notwithstanding *Link*, this Court has stated that "[d]ismissal is *usually* inappropriate where the neglect is solely the fault of the attorney." *Carter v. City of Memphis, Tenn.*, 636 F.2d 159, 161 (6th Cir. 1980) (per curiam) (emphasis added).

### 3. Analysis

#### i. Willfulness, Bad Faith, or Fault

"For a plaintiff's actions to be motivated by bad faith, willfulness, or fault, his conduct must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [his] conduct on those proceedings." *Wu*, 420 F.3d at 643 (quoting *Mulbah v. Detroit Bd. of Educ.*, 261 F.3d 586, 591 (6th Cir. 2001) (internal quotation marks omitted) (alteration in original)).

The district court found that Bradley's conduct demonstrated an intent to thwart judicial proceedings or, at least, a reckless disregard for the effect of his conduct on those proceedings. Specifically, the district court explained that "[a]t a time when he believed he no longer had any ownership share in relevant Delp companies, on at least four occasions, Brad[ley] snuck into Cleves' office looking for information Brad[ley] believed would help frustrate Cleves and Erblich's scheme. That is theft." (R. 105, Order Dismissing Second Am. Compl., PageID# 20.) The district court went on to describe that "if all of this conduct was not bad enough, Brad[ley] attempted to cover up the nature and extent of his searches by offering incredible hearing

testimony," in that "[p]ortions of that testimony are so squarely contradicted by the record on points so fundamental to the nature of the searches, or reflect such intricate tales of how he obtained certain documents, that this [c]ourt cannot reasonably ascribe the contradictions to faulty recall or innocent misstatements." (*Id*. at 21.)

Bradley contended that because he voluntarily and timely produced the documents he stole, he did not intend to be malicious or act in bad faith. The district court addressed his contention by stating that "Brad[ley]'s insistence that his document production shows a litigant attempting to 'come clean' about his conduct rings hollow in light of his incredible hearing testimony about his searches." (*Id*. at 22.) The court also mentioned that Bradley "does not benefit from the more forgiving treatment courts typically afford in cases where sanctions are sought for an attorney's missteps." (*Id*. at 21 (collecting cases).)

More importantly, Bradley does not directly challenge the district court's finding of bad faith. (*See* Pls.' Br. at 23−54 (challenging the court's authority to consider bad faith conduct prior to the litigation, the other three *Regional Refuse* factors, and the district court's factual findings as they pertain to the court's denial of the post-judgment motions).) At oral argument, Plaintiffs' counsel insisted that they had properly challenged the district court's finding of bad faith, and reiterated the same arguments made in the opening and reply briefs. However, the Plaintiffs' opening brief only discusses the *Regional Refuse* "bad faith" factor in the context of *when* the court can consider such conduct, i.e., pre-litigation versus litigation conduct. Even if this discussion challenged, albeit indirectly, the finding of bad faith, Plaintiffs' bad faith challenge would still fail due to the reasons mentioned throughout this opinion.

We find that the district court did not abuse its discretion in finding that Bradley's conduct displayed bad faith. This factor weighs in favor of finding that the dismissal of Plaintiffs' Second Amended Complaint was appropriate.

### ii. Prejudice

We must next consider "whether the adversary was prejudiced by the dismissed party's conduct." *Knoll*, 176 F.3d at 363. The key to finding prejudice is whether the errant party "waste[d] time, money, and effort in pursuit of cooperation which [the errant party] was legally obligated to provide." *Harmon*, 110 F.3d at 368 (finding prejudice caused by the plaintiff's failure to respond to interrogatories).

Here, evidence in the record shows that Bradley wasted Defendants' time, money, and effort in Defendants' pursuit to reveal the truth about his theft. The district court stated that his conduct "tainted the proceedings" because he "refused to play by the [ ] Rules [of Civil Procedure]" by providing untruthful testimony regarding the nature and extent of his searches and by likely not providing all of the documents he stole. (R. 105 at 22−23.) The court noted that "Cleves invested a significant amount of attorney time and money attempting to uncover the nature and extent of Brad's theft." (*Id.*) With regard to the proceedings going forward, the court explained that Cleves "'know[s] little more now than [he] did when they began about how'" he obtained the documents and how much more information he obtained which he is not producing. (R. 105 at 22 (quoting *Regional Refuse*, 842 F.2d at 155) (alteration in original).) The court further mentioned that Cleves was worried about the information Bradley had obtained from the stolen documents he reviewed, and how that information influenced his legal strategy prior to and during the proceedings.

We find that the record clearly demonstrates that Defendants were "prejudiced by the dismissed party's conduct." *Knoll*, 176 F.3d at 363. Thus, this factor weighs in favor of finding that the dismissal of Plaintiffs' Second Amended Complaint was appropriate.

### iii.    Prior Notice

The third factor is a "key consideration" in determining whether a district court abused its discretion. *Schafer*, 529 F.3d at 737 (citation and internal quotation marks omitted). "This [C]ourt has repeatedly reversed district courts for dismissing cases because litigants failed to appear or to comply with pretrial orders when the district courts did not put the derelict parties on notice that further noncompliance would result in dismissal." *Wu*, 420 F.3d at 644 (quoting *Harris v. Callwood*, 844 F.2d 1254, 1256 (6th Cir. 1988) ("[I]n the absence of notice that dismissal is contemplated[,] a district court should impose a penalty short of dismissal unless the derelict party has engaged in 'bad faith or contumacious conduct.'")).

Here, Plaintiffs were indisputably on notice from the district court that it was seriously considering dismissing the Second Amended Complaint with prejudice. The district court granted leave for Defendants to depose Bradley regarding the theft of attorney-client communications after he had produced documents during discovery in February 2015. Defendants then filed a motion for sanctions requesting that the court dismiss Plaintiffs' complaint with prejudice. The court set a hearing date for the motion for sanctions, which gave Plaintiffs' two months to oppose the motion. Due to attorney health issues, the court granted Plaintiffs' request for an extension of time to file an opposition to the motion for sanctions, which extended the opposition deadline and hearing date to late August 2015. Shortly before these deadlines, Plaintiffs filed another motion seeking an evidentiary hearing on the motion for sanctions, another extension of time to oppose, and leave of the court to supplement the record

with Bradley's affidavit, which the district court granted. In October 2015, the court held a three-day evidentiary hearing, and sought supplemental briefing from the parties in November 2015.

The record clearly indicates that Bradley was put on sufficient notice that the sanction of dismissal with prejudice was being considered by the district court. Therefore, the third factor, which is a "key consideration" in this Court's analysis, supports the district court's dismissal. *Schafer*, 529 F.3d at 737 (citation and internal quotation marks omitted).

### iv. Alternative Sanctions

Finally, this Court has instructed district courts to look first to an alternative sanction that would protect that integrity of the judicial process, but it has "never held that a district court is without power to dismiss a complaint, as the first and only sanction," and it is reluctant "to require the district court to incant a litany" of possible lesser sanctions. *Schafer*, 529 F.3d at 738 (quoting *Harmon*, 110 F.3d at 368) (internal quotation marks omitted); *see also Freeland v. Amigo*, 103 F.3d 1271, 1280 (6th Cir. 1997) (explaining that "*in the absence of contumacious conduct*, an alternate sanction that would protect the integrity of pretrial procedures should be utilized rather than dismissal") (emphasis added).

The district court believed that dismissal with prejudice, unlike milder sanctions, would address the information Bradley obtained from the stolen documents he produced (and did not produce), and would sufficiently punish Bradley for his attempted cover-up and deter others from similar misconduct. The court also believed that Bradley's attempt to cover up his theft demonstrates "willful defiance of this Court's truth-finding function," and that "[s]uch conduct is classic contumacious behavior." (R. 105 at 26.) The district court considered alternative sanctions, for instance, a preclusion order or a financial penalty. (*Id.*) However, it believed that

any alternative would be fundamentally unfair and that "a sanction short of dismissal with prejudice would not protect the integrity of the legal system. Permitting Brad[ley]'s claims to go forward would reward him for his theft and deception, and set an awful precedent for civil litigation." (*Id.*)

We agree with the district court that dismissal with prejudice was commensurate with the level of misconduct committed by Bradley. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306−07 (11th Cir. 2009) (finding district court did not abuse its discretion when it struck appellant's answer and counterclaims and entered default judgment because such sanctions were necessary to deter other litigants contemplating improper interception of attorney-client communications, punish appellants, and protect the integrity of the judicial process); *see also Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 432, 435 (W.D. Wash. 2002), *aff'd*, 78 F. App'x 588 (9th Cir. 2003) (dismissing plaintiff's complaint as a sanction because plaintiff unlawfully obtained proprietary materials from defendant and perpetrated a lengthy series of elaborate misrepresentations and lies to the district court); *Ponte v. Sage Bank*, --- F. Supp. 3d ---, 2015 WL 5568087, at *5−6 (D.R.I. Sept. 22, 2015) (finding plaintiff's willful invasion of defendant's attorney-client privileged information improper and plaintiff's evasive and untruthful testimony both before and during the evidentiary hearing on the matter warrants dismissal as a sanction).

In sum, we find that all four factors weigh in favor of affirming the district court's decision. We therefore conclude that the district court did not abuse its discretion in dismissing Plaintiffs' Second Amended Complaint with prejudice.

### b. Plaintiffs' Post-judgment Motions

#### 1. Motion to Amend Findings

Plaintiffs next argue that the district court's judgment should be reversed because its factual findings were clearly erroneous, and thus, it erred in denying Plaintiffs' Rule 52 motion. Defendants argue that the district court's factual findings were not clearly erroneous, especially since the court spent three days hearing testimony from Bradley and others, and made credibility determinations which are afforded even greater deference under this Court's review.

Rule 52(a) of the Federal Rules of Civil Procedure describes the deference to be afforded a district court's findings of fact upon the conclusion of a bench trial: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." The Supreme Court illustrated this standard in *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985):

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
> . . .
> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the

> testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id*. at 573−75 (internal citations omitted).

This Court has stated, "the factual conclusions rendered by a district court sitting without a jury are binding on appeal unless this Court is left with a definite and firm conviction that a mistake has been made." *Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 722 (6th Cir. 2003) (quoting *Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 817−18 (6th Cir. 1980) (internal quotation marks omitted)). The appellant has the burden to prove that such a mistake has been made, and merely showing a conflict in the testimony does not satisfy it. *Harrison*, 333 F.3d at 722 (internal citations omitted). Nor is this burden met "by seeking to redetermine the credibility of witnesses." *Id*. (citing *NLRB v. Nichols of Ohio, Inc.*, 472 F.2d 1228, 1229 (6th Cir. 1972)). Additionally, this Court "must review the facts in the light most favorable to the appellee." *Id*. (citing *Sawyer v. Arum*, 690 F.2d 590, 591−92 (6th Cir. 1982)).

Specifically, Plaintiffs attack four of the district court's factual findings: (1) that Bradley reviewed sensitive documents attached to two emails; (2) that Bradley's description of the unauthorized computer searches conflicted with the record; (3) that Bradley deliberately lied about how he accessed Cleves' computer; and (4) that Bradley did not have a good faith belief that he was an owner of the Delp Company when he made those unauthorized searches.

### i.   CaseMap and Ex Parte Mediation Statement

With regard to the first challenged factual finding, the district court found that Bradley had reviewed two extremely sensitive documents that were attached to two emails in Cleves' inbox—a CaseMap data file containing litigation strategy and an ex parte meditation statement.

This was one of several findings used to support the district court's conclusion that Bradley reviewed or obtained more emails or documents than he had revealed to the court.

Bradley argues on appeal that this finding was clearly erroneous because the two emails at issue were replies to the emails that actually contained the extremely sensitive attachments. He contends that the attachments contained in the prior emails would not have been forwarded, or attached, to the replies. Thus, he asserts that he would not have reviewed those attachments since all he reviewed and printed were the replies. Defendants contrarily argue that first and foremost, Bradley failed to raise this argument in front of the district court either before or during the evidentiary hearing. Bradley only raised it in his post-judgment motion and on appeal. Second, Defendants argue that the district court had no obligation to take Bradley at his word.

We agree with Defendants that the district court did not err in finding that Bradley reviewed two extremely sensitive documents. The district court noted that Bradley had unfettered access to Cleves' computer and email for at least 75 minutes during the two times he accessed the computer, and that he could have easily accessed the emails with the attachments, especially given their nature and importance to the litigation occurring at that time. Bradley's last known incursion occurred just two days before a scheduled mediation. Bradley, when questioned at the hearing about whether he reviewed the ex parte mediation statement, stated that he was "more interested in the e-mail[]s transmitting a mediation statement versus what the mediation statement actually said." (R. 101 at 124.) At the hearing, he also explained to the district court that he was searching through Cleves' computer not to look for material related to the mediation, but because it "was the first day [he] returned to Toledo after a month and a half to [his] offices. It had nothing to do with anything other than [he] was back in Toledo for the

first time." (R. 101 at 125.) The district court found Bradley's explanations unbelievable and far-fetched. Due to the inconsistencies between the hearing testimonies, the documents produced, and Bradley's affidavit, we find that the district court's factual finding pertaining to Bradley's review of the two documents containing information on Defendants' litigation and mediation strategy were not clearly erroneous.

### ii.   Bradley's Description of Computer Searches

With regard to the second factual finding, the district court found that Bradley's testimony about his email searches could not be believed because, in addition to the finding discussed in the preceding paragraph, he testified that he only searched for emails with the term "Erblich," even though he produced emails that did not contain that search term.

On appeal, Bradley argues that this finding was clearly erroneous because he stated at the hearing that he searched through emails containing that search term and other emails in Cleves' inbox. Defendants argue that the transcript from the hearing contravenes Plaintiffs' assertion.

The record demonstrates that the emails and documents produced by Bradley were at odds with his testimony. The district court found that Bradley produced several emails that did not include the search term, "Erblich." At the evidentiary hearing, the district court asked Bradley the following questions concerning his version of how he searched Cleves' computer during the two unauthorized occasions:

> Q:   Okay. How far back in time did you look through Cleves Delp's computer?
> A:   I searched Erblich, as I said in my affidavit, and I printed off every e-mail that I looked at. And I was disgusted, and I was done. I was not interested in any more of what I saw because I saw enough.
> Q:   Did you perform any other searches other than searching for Erblich?
> A:   No.

(R. 101 at 85.)

Q:    When you jiggled the mouse, the computer screen came alive. What did you see?
A:    E-mails.
Q:    You saw Cleves' e-mail inbox, correct?
A:    Correct.
Q:    Then what did you do?
A:    I searched.
Q:    What terms did you search?
A:    One term, "Erblich."

(R. 101 at 115.)

Bradley had the following reaction when the district court confronted him about the discrepancy between the documents he produced and his testimony:

Q:    How in heaven's name did BDelp 1447 come up on a search of the word "Erblich"?
A:    I obviously printed this e-mail, and I produced it.
Q:    Mr. Delp, you performed more searches than just on the word "Erblich," correct?
A:    Incorrect. I only searched "Erblich."

(R. 101 at 127.)

The record indicates that the district court properly found that Bradley's description of his unauthorized computer searches did not square with the emails he produced. Bradley is asking this Court to disregard the evidence in the record and disregard the district court's credibility determination, and take Bradley at his word that he instructed the district court that he reviewed other emails without that search term. Bradley's word is not a proper basis for finding clear error. *Harrison*, 333 F.3d at 722 (stating that the appellant's burden is not met merely by showing a conflict in testimony nor by seeking to redetermine the credibility of a witness) (internal citations omitted). Therefore, we find that the district court did not clearly err in finding that Bradley's description of the searches contradicted the evidence that was actually produced.

### iii.    How Bradley Accessed Cleves' Computer

With regard to the third challenged finding, the district court found that Bradley deliberately lied about how he accessed Cleves' computer.  Plaintiffs argue on appeal that because he admitted that he accessed Cleves' computer twice without authorization, he had no reason to lie about how he accessed the computer, and any testimony about how he accessed the computer is immaterial.  Defendants assert that Bradley had every reason to lie about how he accessed Cleves' computer because of the criminal implications he exposed himself to under state and federal authority for intentionally or knowingly accessing another's computer without authorization.

We find that the district court did not clearly err in finding that Bradley deliberately lied about how he accessed Cleves' computer.  Bradley testified at the hearing that he sat down at Cleves' desk after hours because he was "curious," and after sitting down, he "jiggled" the computer mouse, the computer screen turned on, and Cleves' email inbox instantly appeared. (R. 101 at 77−78, 81, 113−15.)  He denied entering any kind of login information or knowing Cleves' computer password.  However, testimony from the network administrator, Ryan Valek, completely contradicted Bradley's testimony.  Valek explained at the hearing that Cleves' computer, like all Delp Company computers, required a password to access the computer and the computer system automatically logged out after ten to fifteen minutes of inactivity.  After the computer logged out, the user would need to enter a password to gain access to email and any other part of the Delp Company's computer network.  Valek also testified that passwords change periodically, that the password and inactivity logout settings could only be changed at the administrator level, and that Valek, as network administrator, did not change any of these standard settings on Cleves' computer.

Thus, we find that the district court did not clearly err in finding that Bradley lied about how he accessed Cleves' computer. Bradley argues that *how* he accessed the computer is immaterial since he admitted to the unauthorized access itself. This argument is delusive and unpersuasive. As the district court recognized, Bradley's fantastic testimony "goes to the heart" of his misconduct and is further proof for why dismissal in this instance is necessary to preserve the integrity of the judicial system. (R. 105 at 12.)

Plaintiffs cite to *Montaño v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008), to support this "immateriality" argument. Plaintiffs' citation to *Montaño* is unpersuasive. In *Montaño*, the Seventh Circuit reversed the district court's sanction of dismissal because several of the plaintiffs gave inconsistent accounts between their deposition testimony and trial testimony of their alleged mistreatment by the police officers. 535 F.3d at 563−565. The district court dismissed the plaintiffs' civil rights action because it found that these inconsistent accounts amounted to perjury. *Id*. The Seventh Circuit reversed the dismissal and concluded that such inconsistencies went to the heart of the plaintiffs' claims, and that the jury would consider such credibility determinations. *Id*. at 565. The Seventh Circuit also explained that there is a "marked difference between a witness who knowingly lies about a material matter and a witness who is impeached with a prior inconsistent account of a sudden and chaotic event that happened years ago. The former is almost always perjury; the latter may be the product of confusion, mistake, or faulty memory." *Id*. at 566 (citations omitted). Unlike the "sudden and chaotic" event that took place in *Montaño*, the event here was not sudden and chaotic: Bradley accessed Cleves' computer at least twice. Thus, the district court did not clearly err in finding that Bradley lied about how he accessed Cleves' computer and emails.

### iv. Bradley's Excuse

With regard to the last factual finding, the district court found that Bradley's justification for his unauthorized searches of Cleves' computer and theft, which was that he in good faith believed that he was still an owner of the Delp Company, were "post-hoc justification[s]" and "objectively unreasonable." (R. 105 at 17.) Plaintiffs argue that the district court failed to take into account testimony from Cleves Delp and the Delp Company's president, Patrick Boyle, the significance of a company policy, and two February 2011 letters, which all support Plaintiffs' assertion that Bradley believed in good faith that he was the owner of the company at the time he accessed Cleves' computer and emails. Defendants argue that the record expressly contradicts Plaintiffs' argument, and that Plaintiffs cannot meet their burden of proving mistake merely by showing that the there is a conflict in the testimony.

We agree with Defendants and find that the district court did not err in finding that Bradley's excuse for accessing Cleves' computer was unreasonable. In the Second Amended Complaint, Plaintiffs claimed that Bradley signed a purchase and sale agreement that established a $2,411,907.00 purchase price for his interest in the DelHold, LLC, even though the "parties had not yet agreed to all of the payment terms." (R. 37, Second Am. Compl., PageID# 364−65.) Bradley also admitted during the evidentiary hearing that he had transferred certain of his shares in The Delp Company prior to the date of the incursions. He also testified that he reported the sale of his interest in DelHold, LLC to the IRS in 2009 for $2,411,907.00, although his affidavit, dated August 10, 2015, stated that his ownership interest in DelHold, LLC, had been uninterrupted since the corporation was formed in 1992. When asked at the hearing whether Bradley believed that, at the time this February 2, 2011 letter was written, he had sold his interest to a certain trust entity created by Cleves, he responded, "Possibly." (R. 101 at 15.)

Moreover, the February 2011 letters from Bradley's former attorney concern the "sale of Mr. [Bradley] Delp's interest in the Delp Company," in which his former attorney wrote that "Mr. [Bradley] Delp believe[d] this was a sale to a trust created by Cleves Delp," and that Bradley and his attorney requested a "complete set of the final, executed documentation concerning such transactions." (R. 101 at 12−20; Defs.' App., Ex. B, Feb. 2, 2011 Letter, PageID# 135−37.) Bradley also testified that if this letter was "incorrect in any way," he would have notified his lawyer about the mistake. (R. 101 at 20.)

Bradley's "good faith belief" argument is further contradicted by an email he wrote to Cleves in August 2010, in which he notes a default under the Promissory Note "associated with the Purchase and Sale agreement of my interest in DelHold, LLC dated January 1, 2009." (R. 101 at 40−41; Defs.' App., Ex. G, Aug. 26, 2010 Email from Bradley to Cleves, PageID# 223.) The record also shows that Bradley admitted during the evidentiary hearing that he reported the sale of his partnership interest in DelHold, LLC, to the IRS on his 2009 federal income tax return, and the sale price reported to the IRS matched the amount stated in the Purchase and Sale Agreement signed by Bradley for $2,411,907.00. We find that the district court did not clearly err in finding that Bradley did not have a good faith belief that he was still the owner of the company when he stole the documents and accessed Cleves' computer and emails.

### 2. Motion to Alter or Amend Judgment

Finally, Plaintiffs argue that the district court abused its discretion and committed reversible error by refusing to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) because the judgment is based on a clear error of law and constitutes a manifest injustice as

it prevents Bradley from recovering any damages. Defendants contend that the district court did not abuse its discretion as Plaintiffs fail to show how the judgment creates a manifest injustice.

This Court generally reviews a grant or denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion. *ACLU of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 450 (6th Cir. 2010). A district court may grant a timely Rule 59 motion to alter or amend judgment to correct a clear error of law; to account for newly discovered evidence or an intervening change in the controlling law; or to otherwise prevent manifest injustice. *Id.* (citations and internal quotation marks omitted). This Court has noted that its "cases do not offer clear guidance as to what qualifies as 'manifest injustice,' but the plain meaning of those words is instructive." *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 330−31 (6th Cir. 2014). Manifest injustice is defined as "[a]n error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds." *Black's Law Dictionary* 982 (8th ed. 2004).

Specifically, Plaintiffs argue that the judgment constitutes a manifest injustice because it "wrongfully relieves Defendants of liability for their breach of fiduciary duty" stemming from "the wrongful misappropriation of [Bradley's] $20 million interest in the family business." (Pls.' Br. at 55.) Plaintiffs assert that since Cleves did not file an answer to the Second Amended Complaint, the district court should have assumed that the allegations in the complaint were true for purposes of deciding whether to dismiss the action. Plaintiffs contend that the district court failed to discuss the evidence Plaintiffs presented concerning Cleves' bad faith conduct, such as allegations that Cleves and his attorneys back-dated and fraudulently notarized key documents. Defendants claim in their brief that "[a]lthough not formally included in the [record], the parties

discussed and determined no formal answer need be filed while 'gateway' discovery remained ongoing." (Defs.' Br. at 3 n. 2.)

We find that Plaintiffs waived this argument concerning Defendants' failure to file an answer because they did not raise it before the district court. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1398−99 (6th Cir. 1995) (noting that a party must squarely present in the district court the argument that is in front of the appellate court).

Additionally, Plaintiffs do not cite to any case law or any part of the record in their opening appellate brief or their reply brief to support this contention that the district court made a clear error of law by not taking the allegations concerning Cleves' bad faith conduct in the complaint as true when it chose to sanction Plaintiffs by dismissing the action. As Defendants point out, Plaintiffs fail to cite to any authority where a court found a judgment manifestly unjust because the plaintiff's alleged damages outweigh any misconduct, bad faith, or deceitfulness by the plaintiff and override the district court's inherent authority to provide a fair forum for its litigants.

### c. Summary

This Court finds that the district court did not abuse its discretion in dismissing Plaintiffs' Second Amended Complaint with prejudice because Bradley's misconduct was so egregious and such an abuse of the judicial process that it was a fair sanction. Moreover, we find that the district court's findings of fact were not clearly erroneous and that the district court did not abuse its discretion or commit reversible error by refusing to alter or amend the judgment.

## III.   CONCLUSION

For the aforementioned reasons, we hold that Plaintiffs' action was properly dismissed.

Accordingly, we **AFFIRM** the district court's judgment.